CLAUDIUS B. FARNSWORTH *et al. vs.* THE TOWN COUNCIL OF PAWTUCKET *et als.*

Public Laws R. I. cap. 491, June 3, 1875 ; cap. 529, April 12, 1876 ; cap. 530, April 15, 1876; cap. 537, April 18, 1876; cap. 584, February 14, 1877 ; and cap. 703, May 30, 1878, gave to the town of Pawtucket certain powers to condemn land, build water-works, and issue bonds in payment.

These powers defined.

These various acts are to be construed as parts of one general plan.

Every municipal corporation has as such the power to make ordinances or by-laws, but not
to supplement such ordinances with the sanction of a penalty.  For this special legislative
authority is required.

One who contracts with a municipal corporation or its officers is bound at his own peril to
know the limits of municipal power or of the officer's authority.

BILL IN EQUITY for an injunction.

Enactments of the General Assembly of Rhode Island author-
ized the town of Pawtucket to build water-works, and gave to it
certain powers for this purpose.  The present bill was filed by the
complainants as taxpayers of the town to ascertain whether the
proceedings of the commissioners appointed under the acts of the
legislature were or were not in accordance with law.  The acts in
question are enumerated in the opinion of the court, as are the
questions raised and the points made.

*July* 3, 1880.  POTTER, J.  The bill filed May 5, 1879, charges
that the commissioners appointed under the several acts for in-
troducing water into the town of Pawtucket have exceeded their
authority by condemning land for that purpose, no such power
having been given them, and that they have also exceeded their
power in making contracts and expending money, which, it is
charged, was limited to $400,000, and prays that all contracts
made by them over said sum may be declared illegal, and that
the town treasurer may be restrained from paying for certain
lands purchased, and certain judgments obtained against the town
for lands condemned, and that the town council may also be en-
joined from making certain purchases and expenditures.

The respondents deny that the commissioners or council have
exceeded their authority, and contend that the town has ratified
their doings, and further that the complainants, on account of their
own laches and acquiescence, are not entitled to relief.

Had the water commissioners or the town power to condemn
lands, &c., for said purposes?  The difficulty of deciding grows
out of the number of acts relating to the subject, and the rules of
interpretation to be applied to them.

By Pub. Laws R. I. cap. 491, passed June 3, 1875, the tax-
payers of the town of Pawtucket were authorized to vote upon
the question of introducing water into their town, and the town
was authorized to purchase, take, and hold land, &c., and to issue
bonds, &c., not exceeding $500,000, for that purpose.  The town

council were to elect three water commissioners, to exercise so much of the powers as might be defined by an ordinance of the town. The money was to be expended by the town for said purpose as the town council should by ordinance direct.

By Pub. Laws R. I. cap. 529, April 12, 1876, an act in *amendment* of the former act provided that the town might condemn land and have the damages appraised, where the owners should not agree with the town.

Pub. Laws R. I. cap. 530, of same date, April 12, 1876, submitted to the taxpayers the question of introducing water, at an expense not exceeding $600,000. As $500,000 had been before sanctioned by the legislature, this, in fact, only added $100,000 to the amount to be expended, and that seems to have been its only object. This act does not purport to be an amendment of cap. 491.

By Pub. Laws R. I. cap. 537, April 18, 1876, cap. 491 was amended by adding " Grant's brook " as an additional source of water; and by Pub. Laws R. I. cap. 584, February 14, 1877, cap. 491 was amended to include "Abbott's run." The original sections are made to read as amended. Section 2 of said act was also amended.

This was the form and shape of cap. 491 as it then stood revised upon the statute book.

March 30, 1877, after cap. 491 had been so amended, the town, by its taxpaying voters, decided to introduce water, and authorized the issue of $400,000 bonds.

April 2, 1877, the town council, as they were authorized to do by cap. 491 and cap. 584, selected Abbott's run as the source of water, and the same day they, by their own ordinance, gave to the water commissioners all the powers conferred on the town by cap. 491 and its amendments, limiting the power of the commissioners, however, to the sum of $400,000.

As the water commissioners did not organize until April 2, after these acts and votes were passed, it seems no land could be or was condemned before that date.

So far as these acts repealed portions of cap. 491 and substituted entire new provisions in their stead, making the act to read as if it had been so originally enacted, we are of opinion that all

subsequent acts and proceedings referring to cap. 491 must be construed to refer to it as it there stands, unless plainly otherwise intended. And so far as cap. 529 amends cap. 491 by conferring on the town the power to condemn lands, the majority of the court are of the opinion that the acts are to be taken as parts of a system, and that, therefore, cap. 529, as to everything done after its passage, is also to be considered as a part of cap. 491, and that, therefore, the words "this act" in cap. 491 must be considered as including cap. 529.

If then the council had by Pub. Laws R. I. cap. 491, § 3, the power to confer the powers of the town upon the water commissioners, they might also confer on them the power to condemn land, under cap. 529. Did they have any such power?

Many of the points and arguments made in the case turn on the varying use of the words town and town council in the act. It must be confessed that they do not seem to be used with any very definite idea of their meaning. For instance, by cap. 491, § 7, the town is most graciously authorized to spend its own money, derived from the sale of its own bonds in such manner as its town council may direct. The council cannot spend the money, but may direct the town to do so, and the town may obey, but is not obliged to.

This absurdity would follow from holding that the words town, &c., necessarily implied the action of the town in town meeting. What did the legislature mean? There is no doubt but that "town" may be construed to include the action of the town by its proper agents or authorities, if necessary to avoid a construction which leads to absurdity, and when it appears to carry out the spirit of the act. And the fact that such a construction of § 7 leads to this absurd conclusion may aid us in ascertaining their intention in construing § 3 of the same act.

There is indeed one case where the powers given to the town by these acts must of necessity be exercised or sanctioned by the town at a meeting of taxpaying voters, and that is in the preliminary vote to introduce water and to pay the expense of it. It would be of little use for the Constitution to give to the taxpayers power to regulate taxes and expenditures of money if the council elected by nontaxpayers could incur debts and bind the

town to pay them. And to undertake to authorize them to do so would seem to be in conflict with the spirit of the Constitution, and the legislature seemed so to have considered it, for in two acts, cap. 491 and cap. 530, of the three acts of this sort, they made special provision for submitting the question to the vote of the taxpayers; but after the town, as a town and with a full understanding of the effect of this action, had given its sanction, the power of management might well be vested in another body, as a town must in managing matters act by agents.

In regard to one act, Pub. Laws, R. I. cap. 703, May 30, 1878, there may be some doubts as to its construction. It provides that in addition to the bonds, &c., authorized by cap. 491, the *town* may issue bonds, &c., to not exceeding the further sum of $200,000 on the terms and conditions specified in said act or its amendments. This can hardly refer to the $200,000 not issued out of the $600,000 formerly authorized, as the power to issue at least $100,000 of that already existed. The only reason for thinking that it was not meant to authorize $200,000 more bonds, so as to increase the amount to $800,000 is, that while in the two former acts, cap. 491 and cap. 530, the legislature had provided for submitting the question of expending it to the taxpayers, that provision is entirely omitted in this act. Perhaps it was accidental; but while the town could not incur the debt without the authority of the legislature, neither could the legislature authorize the council or nontaxpayers to incur it. All difficulty may be avoided by construing "town" in this instance to refer to the taxpaying voters of the town, and as the act relates to an appropriation and expenditure of money by the town, that seems a natural construction.

It is contended on one side that the town alone, meaning in town meeting, must pass an ordinance before the council could vest any authority in the water commissioners, as cap. 491, § 3, provides that the council may by ordinance provide for electing water commissioners to execute such portions of the powers given by this act "as may be defined by an ordinance of said town, as aforesaid."

On the other side, it is contended that the council had power to pass this ordinance:

First, Because there is nothing in the act for " said town as aforesaid " to refer to, and therefore it must mean the council.

Second, That the town has no power to pass ordinances, and therefore the words must be intended to refer to the council.

Third, That the town has ratified these proceedings by its vote in town meeting, August 5, 1878.

It is further contended that if the council and water commissioners have acted *bonâ fide* upon even a doubtful construction of the act, the complainants by looking on while the expenditure was made, and taking no effectual measures to stop it, have by their laches and acquiescence lost their right to relief.

The argument from ratification by the town we do not think is entitled to much weight, and the argument that the town has no power to pass ordinances depends on the fact that in the revision of 1872 the legislature omit a provision contained in the revision of 1857, empowering towns to enact ordinances and impose penalties for their violation.   True, they may not now impose penalties, but the power to make by-laws, or ordinances, which are the same thing, is essential to the existence of a municipal corporation.   They must, of necessity, have the power to prescribe regulations for the conducting of the business which the legislature has empowered them to transact.

But considering, as we think we must, the several acts as parts of one system, and for the other reasons before given, we feel obliged to hold that the vote of the council did vest in· the water commissioners the powers it purported to.

We do not mean to say that there is no weight in the argument of the respondents as to the effect of the delay and acquiescence on the part of the complainants, although we do not decide this point upon that ground.   Here was a great public work commenced and prosecuted with great speed and energy.   The first appropriation was made March 30, 1877 ; and June 1, 1878, eleven months before the bill was filed, a report was made to the council that the money was nearly expended, and May, 1878, the council had voted to apply to the legislature for an increase of power to issue bonds ; and two of the complainants were members of the council, and the complainants are men having held and now holding places of trust and confidence by the votes of

their fellow-citizens. They have seen the work nearly completed before taking any active measures to question the authority. Allowing that the act was of doubtful meaning, the town officers had put a construction upon it and were publicly acting upon that construction.

But while holding that the vote of the council granting power to the water commissioners is valid, there is still another question remaining : whether they have exceeded these powers.

The water commissioners were a body of officers with large powers indeed, but limited to the amount of $400,000 by the vote which gave them these powers, and everybody who dealt with them was bound to look to the extent of their authority.

The town itself is limited in its powers, and so are its officers.

In affairs between individuals, if an agent is acting under a special power, the person dealing with him is bound to know the extent of his power. So, if an agent has a power to borrow a particular sum of money, and, after borrowing the amount from one person, borrows more from another, the first lender is negligent if he does not require the power to be delivered up to him or have his loan indorsed upon it, so as to prevent fraud by the agent. Wharton on Agency, §§ 131, 132, and 137.

And, says Judge Dillon, Municip. Corp. §§ 88 and 372, it is a fundamental principle that all who deal with a municipal corporation or its officers must, at their peril, inquire into their power to do the act, and so as to the agent of a municipal corporation.

And so power given to a town treasurer to borrow a limited sum is exhausted when he has borrowed it, and the town is not liable if he borrows more. *Lowell Five Cents Savings Bank* v. *Inhabitants of Winchester*, 8 Allen, 109 ; *Ramsay* v. *The Western District Council*, U. C. 4 Q. B. N. S. 374 ; *Law* v. *The People*, 87 Ill. 385.

In the present case the proceedings of the town council were of record, and those records showed the limitation. It would seem that the water commissioners kept records, and if they did not, that very fact should have prevented prudent persons from dealing with them.

That the water commissioners were limited to an expenditure of $400,000 is admitted. If the council had limited them to

$600,000 at the time they passed the ordinance, there would be no doubt of their power to do so, but we seem to be without the means in the present case of deciding whether the water commissioners have exceeded this limit.

On page 6 of the evidence, Mr. Collyer testifies that up to June 1, 1878, the water commissioners had incurred debts in excess of $400,000 bonds, claims for damages, &c. ; but the town committee, page 16, had expended a large sum, $143,858, up to September 22, 1879, in paying bills and claims, so that, for aught we know, a part of the liabilities of the water commissioners over $400,000 may have been thus paid. Nor do we know how much of the money they have spent is properly chargeable to a construction account, nor how much of it was before or since the filing of the bill.

We think the water commissioners should remain enjoined from making any further contracts or expenditures under the vote of April 2, 1877, in excess of the amount authorized by that vote, and the town treasurer from paying their orders.

But the greater part of the expense has been paid upon orders of the town council, and without taking any legal measures to prevent it up to the filing of this bill. And without intending to recognize any authority in the council to bind the town without authority from the town or by law, we think the power may well be inferred from the last clause of cap. 491, § 7, on the ground, as we have before said, that any other construction would lead to absurdity, and we are not to presume that the legislature intended an absurdity.

That act of the legislature was accepted and acted upon by the taxpayers of the town. We think, therefore, there is no reason for enjoining the council from paying any judgment or any contracts for the purchase of lands or other legal contract, nor for enjoining the treasurer from paying their orders.

*Decree entered July* 10, 1880, *dismissing the bill.*

*W. W. Blodgett & Frederick P. Read,* for complainants.

*Charles Hart, James M. Ripley, Pardon E. Tillinghast,* Town Solicitor of Pawtucket, *& Oscar Lapham,* for different respondents.